| | | |
|---|---|---|
| MOSTAFA SAID, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM OF** |
| | ) | **DECISION AND ORDER** |
| | ) | |
| KRISTI NOEM, in her official capacity | ) | |
| as Secretary of Homeland Security, et al., | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

**THIS MATTER** is before the Court on Petitioner's Second Emergency Motion for Temporary Restraining Order and Preliminary Injunction, [Doc. 22], which the Court construes as a motion for preliminary injunction.

I.      BACKGROUND AND PROCEDURAL HISTORY

Petitioner Mostafa Said ("Petitioner") is a native and citizen of Egypt.  He fled Egypt due to persecution and entered the United States on September 9, 2024, without inspection.  [Doc. 1 at ¶¶ 1, 15].  On Friday, November 21, 2025, during a routine ISAP[1] check-in, Petitioner was detained by ICE Enforcement and Removal Operations (ERO) in Charlotte, North Carolina, without warning and without a custody redetermination hearing ("bond hearing").[2]  [Id. at ¶¶ 27, 29; Doc.

---

[1] "ISAP" refers to the U.S. Immigration and Customs Enforcement's (ICE) Alternatives to Detention-Intensive Supervision Appearance Program.

[2] In Matter of Yajure-Hurtado, 29 I&N Dec. 216 (BIA 2025), the Board of Immigration Appeals (BIA) held that individuals who entered without inspection are "applicants for admission" subject to mandatory detention under 8 U.S.C. § 1225(b)(2)(A) for the duration of their removal proceedings.  29 I&N at 220.  The United States has adopted this position to categorically deny bond eligibility to noncitizens like Petitioner.

1-7 at ¶ 5]. The same day, Petitioner, through his attorney Amro Elsayed, filed a Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 (the "Petition"), seeking release from ICE custody or, alternatively, a bond hearing under 8 U.S.C. § 1226(a) on the grounds that his ongoing detention violates the Immigration and Nationality Act (INA), §§ 236 and 241, 8 U.S.C. §§ 1225 and 1226, and his constitutional due process rights.[3] [See Doc. 1].

On November 25, 2025, Petitioner filed a motion for preliminary injunctive relief, asking the Court to order Respondents to provide him with an individualized bond hearing pursuant to 8 U.S.C. § 1226(a) or release Petitioner from custody under reasonable conditions of supervision ("First TRO Motion"). [Doc. 3]. Petitioner further asked the Court to enjoin Respondents from denying bond eligibility on the sole basis that Petitioner is detained pursuant to 8 U.S.C. § 1225(b)(2) and the BIA's decision in Yajure-Hurtado. [Id. at 1–2]. On December 17, 2025, after full briefing and a hearing on the matter, the Court concluded that preliminary injunctive relief was warranted. [Doc. 18 ("First TRO Order")]. As further set forth in the Court's Order, the Court found that Petitioner was likely to succeed on the merits of his claim that his mandatory detention under § 1225(b) is unlawful and/or violates his procedural due process rights. [See id.].

The Court ordered Respondents to hold a bond hearing pursuant to 8 U.S.C. § 1226(a) within 48 hours of the Court's Order and enjoined Respondents from denying bond on grounds that Petitioner is detained pursuant to 8 U.S.C. § 1225(b). [Id.]. The bond hearing was timely held, but Petitioner was not released on bond because he had "not met his burden to show that he would not be a significant flight risk." [Doc. 19 at 1, 4].

_____

[3] Petitioner also sought the issuance of a temporary restraining order prohibiting Respondents from removing or transferring Petitioner outside the jurisdiction of this Court or the United States pending adjudication of this case, which the Court granted on November 25, 2025, and extended on December 9, 2025. [Id.; Doc. 12 at 3]. This temporary restraining order expired on December 23, 2025. [See Doc. 12].

On February 3, 2026, Petitioner filed a Second Emergency Motion for Temporary Restraining Order and Preliminary Injunction ("Second TRO Motion"), seeking immediate release from custody under reasonable conditions of supervision or, alternatively, release on bond; for the Court to continue an Immigration Court hearing scheduled for February 5, 2026, on the Department of Homeland Security's ("DHS") motion to pretermit Petitioner's asylum application; and to enjoin Respondents from rearresting Petitioner should he be released on bond or under conditions of supervision. [Doc. 22]. As grounds, Petitioner argued among other things that he was being detained without a constitutionally adequate bond hearing. [See Docs. 22, 22-1 to 22-6, 23]. Given the immediacy of the February 5 hearing and based on the representations made by Petitioner regarding the conduct of the bond hearing, the Court granted Petitioner's Second TRO Motion, in part, ordering that the February 5 hearing be continued and enjoining the Immigration Court from issuing, enforcing, or executing any order of removal until this habeas action is fully adjudicated. [Doc. 24 at 11 ("Second TRO Order")]. The Court ordered Respondents to respond to the Second TRO Motion [id. at 11] and the Petitioner to reply [Doc. 26].

After the matter was fully briefed, the Court set the matter for hearing on February 19, 2026. [Doc. 28; 2/19/2026 Minute Entry]. Before the hearing, Petitioner filed additional exhibits to his Second TRO Motion and Respondents moved to file the audio file of the subject bond hearing.[4] [Docs. 29, 30].

At the hearing, the Court played the recording of the bond hearing, which lasted about 25 minutes. Prior to and in connection with the bond hearing, Petitioner submitted to the Immigration Court seven declarations from community members, including attestations by several individuals, including Petitioner's cousin, willing to ensure Petitioner's appearance at all scheduled hearings;

---

[4] The Court will grant this motion, as the audio file was introduced into evidence and played at the hearing.

3

and documentary evidence of Petitioner's moral character and compliance. [Doc. 23-1 at 2-3; Doc. 22-1 at ¶ 7; Doc. 23 at 8; see Doc. 22-2]. In one such declaration, the affiant also attested to expertise in smartphone applications and that he would ensure Petitioner installed and properly used the ISAP smartphone application for timely check-ins, location verification, video calls, and notifications. [Doc. 22-2 at ¶¶ 6–7]. These materials also included two declarations from paralegals of Petitioner's counsel's law firm who attested that their office was never notified of any violations by Petitioner of his ISAP compliance requirements, including ICE check-in and monitoring program requirements. [Doc. 22-2 at 41, ¶ 4: Hernandez Dec.; Doc. 22-2 at 42, ¶¶ 5, 7: McNaught Dec.]. One employee also attested that, if Petitioner ever failed to comply with any requirement, such noncompliance could likely be attributed to technical errors. [Doc. 22-2 at 41, ¶ 4].

The bond hearing proceeded as follows. [Doc. 32-1: Bond Hearing Tr.]. After the Immigration Judge James Ward (the "IJ") advised Petitioner's counsel that no Arabic-Egyptian interpreter was available, counsel waived an interpreter for the hearing on Petitioner's behalf. The DHS argued that it was Petitioner's burden to show he did not pose a flight risk and that, based on the Guerra factors, Petitioner does pose such a risk. The DHS argued that Petitioner had a limited presence in the United States, having arrived just last year, and that he had committed several ISAP violations demonstrating noncompliance with ICE requirements. [Id. at 5]. The DHS presented a log dated November 21, 2025, reflecting that Petitioner missed Biometric Check-ins on December 30, 2024, and September 15, 2025, and that on five (5) other occasions Petitioner's location was not received (the "Log"). [See Doc. 32-1 at 4 (Exhibit 3); see Doc. 8-1 at 19].

After noting that he was familiar with the contents of Petitioner's "well-filed documents, including your request" for a bond hearing, the IJ turned to Petitioner. [Id. at 5]. Petitioner

4

clarified that the DHS, not Petitioner, had filed the bond redetermination hearing request. Petitioner argued that he has been in the United States for over a year, that he has committed no criminal conduct or violations of the law in the United States or elsewhere, that he has obtained a work permit and has an extended network of friends and community; and that he had filed numerous declarations from friends and family and community members attesting to Petitioner's good moral character. [Id. at 5–6, 7].

Petitioner asked IJ Ward to disregard the evidence of the alleged ISAP violations because the Log is hearsay from a private contractor. Counsel argued that he was never informed of any violations by Petitioner. [Id. at 6]. Petitioner further argued that, to the extent there was any violation, it resulted from a technical issue only. Counsel posited that Petitioner "probably" failed to properly share his location from his phone in the manner requested. [Id.]. Petitioner further argued that he did not miss the biometric check-ins listed on the Log. Rather, Petitioner's cousin drove Petitioner from Winston-Salem to Charlotte for the check-in both times, but they were told, "We're too busy," and to return the next day, which they did. [Id.]. Petitioner further argued that he has complied with all immigration proceedings and every ICE check-in. [Id. at 6–7]. Petitioner, however, did not submit any declarations before the hearing attesting to the circumstances of these alleged missed check-ins.

The IJ then offered to take no action at the bond hearing and to allow Petitioner more time to investigate and refute the ISAP violations, which the IJ said were "concerning" to him. [Id. at 7]. The IJ stated that he needed to determine whether Petitioner would be able to comply with bond and "it's looking like he's had some problems." [Id.]. Petitioner declined, stating that this Court ordered that the hearing must be conducted within 48 hours of the Court's Order. [Id.]. The

5

IJ responded that they had conducted the hearing, and he was "going to give [Petitioner] more time." [Id. at 8]. Petitioner again declined, citing this Court's "very strict" time limit. [Id.].

The IJ stated that he would make a decision based only on the evidence before him and that Petitioner's arguments "are not evidence, unfortunately." [Id. at 10–11]. The following exchange occurred:

> MR. ELSAYED TO JUDGE
> Okay. May – before, your honor, we continue, what's the court's position – can I know what the court's position in the bond? Is it going to be denied, or are we going to set the high bond?
>
> JUDGE TO MR. ELSAYED
> Well, I don't – I – I'm still listening to your arguments, so.
>
> MR. ELSAYED TO JUDGE
> Because this is – if the court's going to deny the bonds, then, I'm going to move forward – just like submit this – more evidence. If the court's considered the high bond, that's fine with me, your honor. We can move forward and – with the appeal.
> …
>
> JUDGE TO MR. ELSAYED
> Yeah. I'm going to find, at this time, that I don't have – it's the [Petitioner's] burden to establish he's not a danger – excuse me – a flight risk. I – first of all, I find that he's not a danger to person or property. There's no criminal history here. I – there's good letters of support. My concern is flight risk. And if I release him on bond, he's going to be under the supervision of ICE. And the Department filed, in Exhibit 3, violations – lots of violations, in a relatively short period of time. Now, look – again, I don't know the – you know, what happened with these, but I just have a violations log that shows that he was in violation. So, to me, that demonstrates a risk of flight that I'm not willing to release him on until I have more information on that. So, I'm going to --
>
> MR. ELSAYED TO JUDGE
> Okay.
>
> JUDGE TO MR. ELSAYED
> -- deny bond…

[Id. at 11-12]. Petitioner then moved to continue the matter to file more evidence to oppose the Log. [Id. at 12-13]. The IJ explained that he relies on documents like the Log, which "seems to be an official document," "all the time." [Id. at 13]. The IJ further explained that if Petitioner were to bring in evidence that refutes the Log, he would take it into consideration, but he was going to deny bond that day. [Id.]. The IJ also found as follows:

> [B]ecause of the strict timeframe – and I don't know if this will hold up in the next hearing, but I'm going to find if you have additional evidence that was not available to you at the time – because this was short-set – that if you provide some additional evidence, I'll find that that's a material change in circumstances, because you didn't have the time to produce the evidence from the district court, where some of these things were already discussed. So, I find that that's a material change in circumstances, and I would re-hear your bond, if it comes before me. I'm going to put that in an order, but I don't know – I mean, another judge may find differently, but I think that with the short timeframe, the inability to have that, that that precluded you from providing the evidence that was necessary.

[Id. at 13–14; see id. at 25 ("… I find, as a matter of law, that you can re-file your bond request, and this would be a material chance [sic] in circumstances because you didn't have that available to you at – for – at this hearing.")].

After the IJ denied bond, Petitioner's attorney sought to introduce live testimony of Petitioner's cousin regarding having taken Petitioner to the two alleged missed biometric check-ins. [Id. at 14]. DHS opposed the introduction of further evidence, arguing that the IJ had already issued his ruling and that Petitioner was given a chance withdraw the motion. [Id. at 15]. Petitioner reminded the IJ that he could not withdraw a motion he did not file. [Id. at 15–16]. The IJ stated that he "noticed that afterwards" and agreed that Petitioner "[couldn't] really withdraw it." [Id. at 16]. After a five-minute recess, the IJ returned, noted again that he was denying bond, found that the evidence before him was closed and declined to hear the cousin's testimony, noting there was no notice of it, and admonished Petitioner that if there are ISAP violations, "you should know that

7

that information has to be provided. It's your burden to establish he's not a risk of flight." [Id. at 18, 21].

Petitioner then attempted to draw the IJ's attention to the Declarations of counsel's paralegals "talking about this violation is untrue" and suggested that the IJ had not reviewed the materials submitted by Petitioner. [Id. at 22–23]. The IJ responded that he did take into consideration that the paralegals were never informed of the violations but "when [he] reviewed this evidence yesterday," he did not see any evidence that the violations were inaccurate. [Id. at 24–25].

After listening to the recording of the bond hearing, the Court heard the parties' arguments regarding Petitioner's pending motion for injunctive relief. Petitioner argued that IJs generally are being given guidance and instruction not to release noncitizens like Petitioner. Counsel stated that he was forced to waive an interpreter on Petitioner's behalf because the bond hearing would have been continued without such waiver. Petitioner's counsel stated that, in the over 500 immigration hearings he had attended, this was the first in which a translator was unavailable. Petitioner argued that the IJ refused to hear from the Petitioner and his cousin, who was present to testify that DHS's claim of ISAP violations was false. Petitioner's counsel pointed to inconsistencies on the Log and posited that it had been fabricated. Petitioner's counsel explained that Petitioner does not drive for fear of breaking the law and that his cousin drives him from Winston-Salem to Charlotte for check-ins, returning the next day when the lines are too long to complete the check-in. Petitioner argued that the IJ never asked him why he failed to share his location or otherwise gave him an opportunity to be heard. Moreover, Petitioner appeared at the bond hearing by WebEx, but he could not testify because there was no translator. Furthermore, Petitioner argued that there is no regulation

requiring that any request for rehearing would be heard by the same IJ and a different IJ would not entertain a material change in circumstances claim.

In response, Respondents argued that the IJ was patient, gave Petitioner a chance to present evidence, and offered to continue the bond hearing for Petitioner to obtain more evidence, but Petitioner wanted a decision. Respondents further argued that, after the IJ's decision, Petitioner sought to reopen evidence and offer testimony of Petitioner's cousin without notice to the government in a manner inconsistent with immigration procedure. Respondents further argued that there is no constitutional issue before the Court and that the IJ's discretionary decision is not subject to review.

As for injunctive relief, Respondents argued that due process was provided and that Petitioner, therefore, has failed to show a likelihood of success on the merits, that he is unlikely to suffer irreparable harm as to the conduct of the bond hearing "because of the way the immigration judge handled the hearing," and that the balance of equities and the public interest, which merge when the government is a party, weigh against further injunctive relief.

Petitioner disagreed, arguing that he was unable to present evidence at the hearing and that Petitioner's cousin was present to testify regarding the alleged ISAP violations. Petitioner also argued that he eventually sought to continue the hearing, but that IJ Ward had already denied bond and, therefore, denied Petitioner's request. Petitioner also noted that, even though IJ Ward offered to re-hear the bond motion after affording Petitioner more time, the motion to re-hear would go before a different IJ who would not be inclined to follow IJ Ward's ruling and find a substantial change in circumstances.

Respondents asked to file a transcript of the bond hearing and to thereafter file a supplemental brief with the Court. These have been filed. [Doc. 32-1; Doc. 33]. Respondents

9

largely repeat their previous arguments in this matter. They contend that the bond hearing complied with due process, that IJ Ward exercised his broad discretion to determine that Petitioner failed to carry his burden of proving he is not a flight risk, that §§ 1226(e) and 1252(b)(9) prohibit this Court's review of IJ Ward's decision to deny bond, and that Petitioner has failed to show he is entitled to injunctive relief. [Doc. 33].

Petitioner replied. [Doc. 34]. Petitioner maintains that he was denied a constitutionally adequate bond hearing under § 1226(a) and labeled a "flight risk" based on the unsubstantiated Log. [Id. at 5–6]. Petitioner again argues that the Log was not authenticated nor was there any foundation laid at the bond hearing "necessary to verify its reliability." [Id. at 5 n.4]. Petitioner points to the fact that the Log indicates that he is in expedited removal under § 1225(b)(1), when he has in fact been in full removal proceedings under § 1229a since November 2024. [Doc. 34 at 6, 8]. Petitioner contends that IJ Ward should have required the DHS to authenticate the Log or address "this critical inconsistency" before relying on it. [Id. at 6–8]. Petitioner also argues that IJ Ward failed to meaningfully apply the Guerra framework, which does not include violation of ISAP reporting conditions as a relevant factor. [Id. at 10–11].

Of particular note, Petitioner states that he appeared at a second bond hearing on February 23, 2026, before a different Immigration Judge, IJ Harness, where bond was again denied. [Id. at 6; Doc. 34-1]. In her Order, IJ Harness noted her consideration of this Court's Second TRO Order, especially the due process requirements in immigration bond hearings and the preliminary finding that the evidence relied on by IJ Ward "could not, as a matter of law, establish that Petitioner posed a flight risk." [Doc. 34-1 at 1–2]. She also noted that she considered "all evidence submitted into the record (see Exs. 1–6) as well as the sworn testimony of [Petitioner] and his cousin, Mohamed Elmahdy," and the parties' arguments. [Id. at 2]. IJ Harness noted that her bond determination

10

was guided by the nonexclusive <u>Guerra</u> factors and that she may also consider "an alien's character and potential eligibility for relief as factors in determining the necessity for or the amount of the bond." [<u>Id.</u> at 3 (citing <u>Matter of Andrade</u>, 19 I&N Dec. 488, 489–90 (BIA 1987))]. Moreover, IJ Harness provided that "[i]n assessing these factors, the Immigration Judge may base his decision on 'any information that is available to the Immigration Judge or that is presented to him or her by the alien or [DHS].'" [<u>Id.</u> (quoting 8 C.F.R. § 1003.19(d))].

In determining that Petitioner was not eligible for bond because he failed to meet his burden to show that he would not be a significant flight risk, IJ Harness found and concluded as follows:

> Here, as previously found by the IJ on December 19, 2025, the undersigned IJ finds that there is nothing in the record to indicate that [Petitioner] would be a danger to community if he were to be released on bond. However, as also previously found by the IJ on December 19, 2025, the IJ finds [Petitioner] is not eligible for bond because he has failed to meet his burden to show that he would not be a significant risk of flight.
>
> The Court recognizes that [Petitioner] has some positive factors in this case. [Petitioner] has expressed a fear of returning to Egypt and timely filed an I-589 application. He has received employment authorization to allow him to legally work in the U.S. while this application is pending. He has provided documentation and testimony from his U.S. citizen (USC) cousin who is willing and able to sponsor [Petitioner] to ensure that he appears for future proceedings and would not become a public charge. He also provided numerous letters from other friends and family members who attested to his good character. He has also provided the court with a fixed address where he would be residing with his cousin and his cousin's wife, and has no known criminal history. See Exh. 3.
>
> However, there are also many negative factors in [Petitioner's] case. [Petitioner] has been present in the U.S. for less than 18 months and has no significant family ties to the U.S. that would enable him to reside permanently in the U.S. in the future (i.e., no USC or LPR spouse, parent, or child). While [Petitioner] filed a Form I-589 application for relief with the immigration court, this relief remains speculative and there is a pending motion to pretermit the application pursuant to the Asylum Cooperative Agreement (ACA) with Uganda. Further while [Petitioner] has employment

11

authorization and submitted letters from friends and family indicating that he had steadily worked in the U.S. since arriving, he did not provide a letter from his employer or proof of stable employment (i.e., no paystubs or other documentation verifying employment). [Petitioner] has also provided no proof of property ownership or other asset ownership in the U.S. Finally, there is credible evidence in the record to reflect that [Petitioner] previously failed to appear for scheduled ICE supervision appointments. While this may not have been the reason why [Petitioner's] prior grant of parole from DHS was terminated, it is still relevant to the consideration of whether [Petitioner] is a flight risk for bond purposes.

Therefore, despite the positive equities as stated supra, the Court finds that [Petitioner] has not met his burden to demonstrate to the Court that he is not a significant flight risk if given a bond. There has been no material change in circumstances since bond was denied on December 19, 2025.

[Doc. 34-1 at 3–4 (internal citation omitted)]. Petitioner claims that IJ Harness' Order "contradicted statements made during the proceedings." [Doc. 34 at 6]. That is, Petitioner's counsel identified "significant errors" in the Log, including the statement that Petitioner had been placed in expedited removal proceedings, which is "demonstrably incorrect." [Id. at 6]. Petitioner posits that the Log "may not even correspond to Petitioner." [Id. at 6]. Petitioner, however, does not otherwise take issue with this second bond redetermination hearing. [See Doc. 34].

This matter is now ripe for adjudication.

## II.     ANALYSIS

### A.     Jurisdiction

Respondents argue that 8 U.S.C. §§ 1226(e), 1252(b)(9), and 1252(g) deprive this Court of jurisdiction over Petitioner's challenge to the constitutionality of his bond hearing. [Doc. 25 at 2-5].

Section 1226(e) provides:

> The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention of any alien or the revocation or denial of bond or parole.

8 U.S.C. § 1226(e). This provision does not preclude challenges to "the extent of the Government's detention authority under the statutory framework as a whole." Jennings v. Rodriguez, 583 U.S. ---, 138 S.Ct. 830, 841 (2018). Nor does it "limit habeas jurisdiction over constitutional claims or questions of law." Singh v. Holder, 638 F.3d 1196, 1202 (9th Cir. 2011); see also Kim v. Demore, 538 U.S. 510, 517, 123 S.Ct. 1708 (2003) ("Section 1226(e) contains no explicit provision barring habeas review."). "[C]laims that the discretionary process itself was constitutionally flawed are cognizable in federal court on habeas because they fit comfortably within the scope of § 2241." Singh, 638 F.3d at 1202. Moreover, "'where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear,'" Kim, 123 S.Ct. at 1714 (quoting Webster v. Doe, 486 U.S. 592, 603, 108 S.Ct. 2047 (1988)), and "where a provision precluding review is claimed to bar habeas review, the Court has required a particularly clear statement that such is Congress' intent," id. (citing INS v. St. Cyr, 533 U.S. 289, 308–09, 121 S.Ct. 2271 (2001)).

Because Petitioner here asks the Court to consider whether the IJ violated his due process rights in the conduct of the bond hearing, § 1226(e) does not deprive this Court of jurisdiction over the present motion.

Section 1252(b)(9), the so-called "zipper clause," provides:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall

> have jurisdiction, by habeas corpus … or by any other provision of law …, to review such an order or such questions of law or fact.

8 U.S.C. § 1252(b)(9). The Supreme Court has cautioned against an overly broad application of Section 1252(b)(9), see Jennings v. Rodriguez, 583 U.S. 281, 292–94, which only regards review of orders of removal, see Casa De Maryland v. U.S. Dep't of Homeland Sec., 924 F.3d 684, 697 (4th Cir. 2019) (citation omitted) (finding § 1252(b)(9) applies only to review of an order of removal under § 1252(a)(1)). Petitioner here is challenging his unlawful detention without a constitutionally adequate bond hearing, which does not fall within the scope of § 1252(b)(9). As such, Respondents' argument that this Court lacks jurisdiction under § 1252(b)(9) is without merit.

Finally, Respondents' argument under § 1252(g) is also without merit. Section 1252(g) provides that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary of Homeland Security] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g). The Supreme Court has determined that this section "applies only to three discrete actions that the [Secretary of Homeland Security] may take: her 'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders.'" Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 119 S.Ct. 936 (1999). The Supreme Court has rejected as "implausible" an attempt to convert § 1252(g) into a broad bar on judicial review of all immigration-related claims. Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 19 (2020). Most importantly here, § 1252(g) does not strip federal courts of jurisdiction over habeas challenges by confined noncitizens. See Zadvydas v. Davis, 533 U.S. 678, 688 (2001) (providing that § 1252(g), which applies to decisions "to commence proceedings, adjudicate cases, or execute removal orders" did not preclude habeas proceedings "as a forum for statutory and constitutional challenges to post-removal-period detention"); Suri v. Trump. No. 25-1560, 2025

14

WL 1806692, at *7 (4th Cir. July 1, 2025) ("Because § 1252(g) simply doesn't extend to habeas challenges to present immigration confinement, courts routinely exercise jurisdiction over such challenges."). As such, § 1252(g) does not undermine the Court's jurisdiction over the present challenge.

### B. Exhaustion

Respondents argue that Petitioner should be required to appeal the IJ's denial of bond to the Board of Immigration Appeals (BIA) before seeking relief with this Court. [Doc. 25 at 6-7]. There is, however, no exhaustion provision in § 1226(a). See McCarthy v. Madigan, 503 U.S. 140, 144, 112 S.Ct. 1081 (1992) ("Where Congress specifically mandate" exhaustion of administrative remedies, "exhaustion is required."). "[W]here Congress has not clearly required exhaustion, sound judicial discretion governs." Id.; see also Miranda v. Garland, 34 F.4th 338, 351 (4th Cir. 2022) (recognizing that in the absence of a statutory exhaustion provision, "the district court [has] discretion to decide if administrative exhaustion [is] required").

When discretionary, exhaustion may be excused when "the legal question is 'fit' for resolution and delay means hardship … or when exhaustion would prove 'futile[.]'" Shalala v. Ill. Council on Long Term Care, 529 U.S. 1, 13, 120 S.Ct. 1094 (2000) (citations omitted). "[A]n administrative remedy may be inadequate where the administrative body is shown to be biased or has otherwise predetermined the issue before it." McCarthy, 503 U.S. at 148, 112 S.Ct. 1081 (citation omitted). Here, any additional delay necessarily means substantial hardship for the Petitioner and the result of any appeal appears predetermined in any event. As such, the Court will not require Petitioner to appeal to the BIA for another review before proceeding here. See 8 C.F.R. §§ 236.1(d), 1003.19(f).

15

Because the Court has jurisdiction over Petitioner's challenge to his current detention without a constitutionally adequate bond hearing and because the Court will not require exhaustion of any administrative remedies under the circumstances here, the Court turns to the merits of the pending motion.

### B.  Preliminary Injunction

To obtain a preliminary injunction, the plaintiff must establish (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest.  Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346 (4th Cir. 2009); see Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 21, 129 S.Ct. 365 (2008).  When the constitutional violation is "likely," several of these factors are satisfied.  Leaders of a Beautiful Struggle v. Balt. Police Dep't, 2 F.4th 330, 346 (4th Cir. 2021) (en banc).  That is, when "there is a likely constitutional violation, the irreparable harm factor is satisfied" because "the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitute irreparable injury.'" Id. (quoting Mills v. District of Columbia, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (internal quotation omitted)).  The final two factors are satisfied when there is a likely constitutional violation because "the public interest favors protecting constitutional rights" and "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional." Id. (quoting Centro Tepeyac v. Montgomery Cnty., 722 F.3d 184, 191 (4th Cir. 2013)).  Thus, where a constitutional violation is "likely," the inquiry collapses into the first factor, the likelihood of success on the merits.  See Mahmoud v. McKnight, 2023 WL 5487218, at *14 (D. Md. Aug. 24, 2023), affirmed 102 F.4th 191 (4th Cir. 2024).

Currently, Petitioner asks the Court to immediately release him on bond or subject to reasonable conditions of supervision and enjoin Respondents from pretermitting Petitioner's asylum application or executing any removal order until this case is finally adjudicated. As grounds, Petitioner contends that he was denied bond or release on conditions under § 1226(a) without due process.[5]

The Fifth Amendment entitles all "persons" to due process of law. U.S. Const. amend. V ("No person shall be … deprived of life, liberty, or property, without due process of law…."). No one disputes that the Fifth Amendment entitles noncitizens like Petitioner to due process of law. Reno v. Flores, 507 U.S. 292, 306, 113 S.Ct. 1439 (1993); see Kim, 538 U.S. at 523, 123 S.Ct. 1708. As such, the Due Process Clause protects noncitizens, whether their presence is lawful, unlawful, temporary, or permanent. Zadvydas, 533 U.S. at 693, 121 S.Ct. 2491.

"To determine whether civil detention violates a detainee's Fifth Amendment procedural due process rights, courts apply the familiar three-part test articulated in Mathews v. Eldridge. Hasan v. Crawford, 800 F. Supp. 3d 641, 659 (E.D. Va. 2025) (citing Mathews v. Eldridge, 424 U.S. 319 (1976)). Mathews requires courts to weigh three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335–36. At minimum, procedural due process requires "the opportunity to be heard 'at a

---

[5] On initial and expedited consideration of Petitioner's arguments and materials, the Court granted a temporary restraining order without a response from the Respondents. [Doc. 24]. The Court now has the benefit of their response, Petitioner's reply, the arguments of the parties at the hearing in this matter, an audio recording and transcript of the bond hearing at issue, and supplemental briefing. [See Docs. 25, 27, 29, 32-1, 33, 34].

meaningful time and in a meaningful manner.'" Id. at 333 (quoting Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187 (1965)).  Moreover, "due process is flexible and calls for such procedural protections as the particular situation demands."  Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593 (1972).

Even where detention is allowed, due process requires "adequate procedural protections" to ensure that the government's asserted justification for physical confinement "outweighs the individual's constitutionally protected interest in avoiding physical restraint." Zadvydas, 533 U.S. at 690, 121 S.Ct. 2491 (internal quotation marks omitted).  In immigration bond hearings, due process requires the IJ to consider all relevant evidence proffered by the detainee to assess flight risk or danger.  See Singh, 638 F.3d at 1204–05 (requiring "adequate procedural protections" to present one's case in bond hearings, including consideration of evidence).  Furthermore, due process requires adequate translation of the proceedings so that the noncitizen is not deprived of "an opportunity to be heard at a meaningful time and in a meaningful manner, meaning he did not receive a full and fair hearing on [his] claims."  Singh v. Holder, 699 F.3d 321, 335–36 (4th Cir. 2012) (internal quotation marks omitted).  Majia-Velasquez v. Garland, 26 F.4th 193, 205 (4th Cir. 2022) (due process requires translator at immigration proceedings where substantive matters, such as evidence presentation or witness cross-examination, are involved).

At an individualized bond hearing for non-criminal noncitizens pursuant to 8 U.S.C. § 1226(a), the burden of proof is on the noncitizen to "demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding."  8 C.F.R. § 236.1(c)(8); see also In re Guerra, 24 I&N Dec. 37, 40 (BIA 2006).  In making this determination, an IJ "must consider whether an alien who seeks a

18

change in custody status is a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk." In re Guerra, 24 I&N Dec. 40 (citation omitted).

> Immigration Judges may look to a number of factors in determining whether an alien merits release from bond, as well as the amount of bond that is appropriate. These factors may include any or all of the following: (1) whether the alien has a fixed address in the United States; (2) the alien's length of residence in the United States; (3) the alien's family ties in the United States, and whether they may entitle the alien to reside permanently in the United States in the future; (4) the alien's employment history; (5) the alien's record of appearance in court; (6) the alien's criminal record, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses; (7) the alien's history of immigration violations; (8) any attempts by the alien to flee prosecution or otherwise escape from authorities; and (9) the alien's manner of entry to the United States.

Id. The IJ may base its determination on "any information that is available to the Immigration Judge or that is presented to him or her by the alien or [DHS]." 8 C.F.R. § 1003.19(d). "The Federal Rules of Evidence do not apply in immigration proceedings, and evidentiary determinations are limited only by due process considerations." Anim v. Mukasey, 535 F.3d 243 (4th Cir. 2008).

As to the bond hearing before IJ Ward, the Court finds that Petitioner's due process rights were violated. Weighing the Mathews factors, Petitioner's interest in freedom from civil incarceration is obvious and substantial. As for the second factor, the procedures used caused a pronounced increased risk of deprivation of Petitioner's liberty interest, which could be readily ameliorated with additional procedural safeguards. That is, due to the strict time limit imposed by this Court, Petitioner was constrained to waive an interpreter and therefore the ability to testify and understand the proceedings. Moreover, as recognized by the IJ, Petitioner was unable to gather and/or give proper notice of evidence to refute the Log, which appears to be the sole basis of the IJ's decision to deny bond. Additionally, the IJ asked if Petitioner wanted to move to continue the

19

hearing to allow more time, which Petitioner could not do because the DHS filed the motion. Petitioner could easily be allowed sufficient, reasonable time before a custody determination hearing to gather evidence and to have an interpreter available to enable Petitioner to testify and to understand the proceedings. Without this time, Petitioner was denied the opportunity to be heard at a meaningful time and in a meaningful manner. The Court, of course, recognizes that Petitioner's counsel waived an interpreter before the hearing proceeded. But he did so on the reasonable though mistaken belief that failing to do so would have caused a violation of this Court's Order. Had the Court known that such additional time was necessary to protect Petitioner's due process rights, the Court would have allowed more time and made clear that a continuance at Petitioner's request or to have an interpreter present would not have contravened the Court's order. Finally, the fiscal and administrative burden of these simple, additional procedural safeguards under the circumstances here are not only relatively minimal but were invited by the IJ who conducted the hearing.

For these reasons, Petitioner was prevented from being heard at a meaningful time and in a meaningful manner before he was denied bond or release on supervisory conditions and his liberty further restrained.

The inquiry, however, does not end there. Petitioner has since been provided a second custody redetermination hearing. Petitioner does not contend that this second bond hearing violated his due process rights or otherwise seek any relief relative thereto. Rather, Petitioner intimates only that IJ Harness should have addressed the Log's "critical discrepancy" or required the DHS to authenticate it. Moreover, it appears that the second bond hearing comported with due process in any event. IJ Harness heard testimony from Petitioner's cousin and Petitioner himself, presumably with the assistance of an interpreter. IJ Harness reviewed the record before her and

weighed the information presented relative to the nonexclusive <u>Guerra</u> factors. [<u>See</u> Doc. 34-1 at 3–4]. Furthermore, she was within her discretion to consider the Log.[6] <u>See</u> 8 C.F.R. § 1003.19(d). While this Court would likely have reached a different conclusion as to Petitioner's risk of flight, the Court is constrained not to second-guess and substitute its own judgment for that of the Immigration Judge. <u>See</u> 8 U.S.C. § 1226(e).

In reaching this conclusion, the Court is not at all unsympathetic to Petitioner. It certainly seems that the balance of factors here would have previously been deemed insufficient to support a flight-risk finding. The balance, however, does not land so disproportionally that the Court can conclude that the second bond hearing was a sham or that Petitioner's due process rights were necessarily violated. While the Court would have ordered that a second bond hearing comporting with due process be conducted, such hearing has already occurred and Petitioner does not contend, nor does the limited record support, that his due process rights were violated in its conduct. The Court, therefore, will deny Petitioner's motion for preliminary injunctive relief as moot.

## III. CONCLUSION

In sum, although Petitioner was denied due process at his court-ordered bond hearing, he has since received a second bond hearing which appears to have been conducted in accordance with Petitioner's due process rights. The Court, therefore, will deny Petitioner's pending motion for injunctive relief as moot. The Court will, however, extend its order enjoining the Immigration Court from issuing, enforcing, or executing any order of removal until this habeas action is fully

---

[6] To be sure, the Court is not convinced that there is anything "critical" regarding the discrepancy between Petitioner's actual removal status and the status listed on the Log, which appears to be nothing more than an administrative error. While Petitioner contends that the Log is a fabrication, on the one hand, he twice brought his cousin to testify regarding the circumstances of the two alleged missed check-ins and submitted an affidavit of another individual who would ensure Petitioner installed and properly used the ISAP smartphone application for timely check-ins, location verification, video calls, and notifications. [<u>See</u> Doc. 22-2 at ¶¶ 6–7].

adjudicated pending further orders of this Court.

**IT IS THEREFORE ORDERED THAT**:

1. Petitioner's Emergency Motion for Temporary Restraining Order and Preliminary Injunction [Doc. 22] is **DENIED** as moot in accordance with the terms of this Order.

2. Respondents' Motion to Allow Filing of an Audio File of the Immigration Court Bond Hearing [Doc. 30] is **GRANTED**.

3. The Immigration Court remains **ENJOINED** from issuing, enforcing, or executing any order of removal until this habeas action is fully adjudicated pending further orders of the Court.

**IT IS SO ORDERED**.

Signed: April 2, 2026

Max O. Cogburn Jr.
United States District Judge

22